**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONICA THOMAS, individually, and on behalf of all others similarly situated, <br><br>      Plaintiff, <br><br>        v. <br><br> COMCAST CABLE COMMUNICATIONS LLC; and COMCAST CORPORATION, and FINANCIAL BUSINESS AND CONSUMER SOLUTIONS, INC., <br><br>      Defendants. | Case No. 2:24-cv-05403-NIQA <br><br> **FIRST AMENDED COMPLAINT — CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Monica Thomas, individually, and on behalf of all similarly situated persons, alleges the following against Defendants, Comcast Cable Communications LLC and Comcast Corporation (together, "Comcast") and Financial Business and Consumer Solutions, Inc. ("FBCS")[1] (collectively, "Defendants"), based on personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

### I. INTRODUCTION

1.    Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and other similarly situated customers' ("Class Members," as

---

[1] FBCS is included in this action only as a nominal defendant, where it is a bankruptcy Debtor by virtue of its voluntary petition under Chapter 7 of Title 11 of the United States Code, filed August 29, 2024. *In re FBCS*, No. 24-13029-amc (E.D. Pa. Bankr.), D.E. 1.

defined *infra*) sensitive personally identifiable information, including their names, Social Security numbers, dates of birth, and account information ("PII").

2.      FBCS is a nationally licensed debt collection agency in the United States, specializing in collecting unpaid debts from consumer credit, healthcare, commercial, auto loans and leases, student loans, and utilities. FBCS received Plaintiff's and Class Members' PII from its clients, which is used to collect debts on behalf of its clients. One of FBCS's clients is Comcast.

3.      Comcast is one of the largest companies in the American telecommunications sector, and provides internet services and products, cable television, mobile 5G network cellular services, and landline telephone services and products to individuals and businesses across the United States under the brand name Xfinity.[2]

4.      On information and belief, Comcast used FBCS to collect allegedly unpaid bills from its customers.

5.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6.      On or about April 26, 2024, FBCS announced that certain systems in its network had been subject to unauthorized access between February 14 and February 26, 2024, and the unauthorized actor had the ability to view or acquire certain information on the FBCS network during the period of access ("Data Breach"). In a filing with the Office of the Maine Attorney General, FBCS confirms that the PII of 4,253,394 individuals was exposed by the Data Breach.[3]

---

[2] Comcast, 2022 Annual Report (Form 10-K) (Dec. 31, 2022), available at https://www.cmcsa.com/static-files/156da323-653e-4cc6-9bb4-d239937e9d2f.
[3] FBCS Data Breach Notifications, *Office of the Maine Attorney General*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/7e6ff931-a035-480f-a977-e11a8af7f768.html (last visited Jan. 24, 2025).

7.    On or about August 16, 2024, Comcast began sending out notice letters to its customers, stating that Comcast learned of the data breach at FBCS on March 13, 2024, but that FBCS did not notify Comcast that its customer data had been impacted until July 17, 2024. The letter states that "FBCS received your information because they previously provided Comcast with collections-related services for delinquent payments . . . ."

8.    On October 3, 2024, Comcast filed a notice with the Maine Attorney General confirming that 237,703 individuals impacted by the FBCS data breach were related to the Comcast portion of the breach.[4]

9.    Defendants failed to adequately protect Plaintiff's and Class Members' PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect their customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

10.    Comcast also failed to adequately protect Plaintiff's and Class Members' PII by virtue of its failure to vet its vendors—here, FBCS—and ensure they were submitting PII to an entity with adequate data security practices and that its vendors were deleting or archiving inactive PII data and files.

11.    Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiff and Class Members;

---

[4] Comcast Supplemental Data Breach Notifications, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/aff9fd91-81e8-4d95-a84e-c56f1d48f088.html (last visited Jan. 24, 2025).

(ii) adequately vet their vendor for data security practices (as to Comcast); (iii) warn Plaintiff and Class Members of FBCS's inadequate information security practices; and (iv) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal law.

12.     Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to ensure that FBCS had adequate and reasonable safeguards and measures in place to protect the PII of Plaintiff and Class Members after that information was transferred and entrusted to FBCS in order to enable FBCS to collect the debt owed by Plaintiff and Class Members to Comcast. More specifically, Comcast failed to ensure that FBCS had taken and implemented available steps to prevent an unauthorized disclosure of data, and failed to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption, storage, and destruction of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

13.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe in any further transfers of their sensitive data to third parties and they should be entitled to injunctive and other equitable relief.

14.     Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains

unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

15.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## II. PARTIES

16.     Plaintiff Monica Thomas is a citizen and resident of Colbert County, Alabama.

17.     Defendant Comcast Corporation is a Pennsylvania corporation with its headquarters and principal place of business located at Comcast Center, 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103.

18.     Defendant Comcast Cable Communications, LLC is a Delaware limited liability company that maintains its headquarters at Comcast Center, 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103. Upon information and belief, Comcast Corporation is the only member of Comcast Cable Communications, LLC. Defendant Comcast Cable Communications, LLC is a citizen of each state in which its members are citizens. As such, Defendant Comcast Cable Communications, LLC, is a citizen of Pennsylvania.

19.     FBCS is a Pennsylvania corporation with its headquarters and principal place of business located in Hatboro, Pennsylvania. It is included in this action only as a nominal defendant, where it is a bankruptcy Debtor by virtue of its voluntary petition under Chapter 7 of Title 11 of the United States Code, filed August 29, 2024. *In re: Financial Business & Consumer Sols., Inc.*, No. 24-13029-amc (E.D. Pa. Bankr.), D.E. 1.

## III. JURISDICTION AND VENUE

20.     The Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class Members who are diverse from Defendants, and (4) there are more than 100 Class Members.

21.     The Court has general personal jurisdiction over Defendants because Defendants are each headquartered in this District.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are residents of this district.

## IV. FACTUAL ALLEGATIONS

### A.    *Defendants' Businesses*

23.     As previously alleged, Comcast is one of the largest companies in the American telecommunications sector, and it provides internet services and products, cable television, mobile 5G network cellular services, and landline telephone services and products to individuals and businesses across the United States under the brand name Xfinity.[5]

24.     On information and belief, FBCS accumulates highly private PII of its clients' customers, which is used to collect debts on behalf of its clients, such as Comcast.

25.     Comcast is one of FBCS's clients. Plaintiff provided her PII to Comcast as a condition for opening and maintaining an account with Comcast, and Comcast, in turn, provided the PII to FBCS to collect an alleged debt.

26.     The information held by FBCS in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members, as provided by Comcast.

---

[5] Comcast Annual Report, *supra* note 2.

27.     Upon information and belief, FBCS made promises and representations to its clients, including Comcast, that the PII collected from them, including that of Plaintiff and Class Members, would be kept safe and confidential, that the privacy of that information would be maintained, and that FBCS would delete any sensitive information after it was no longer required to maintain it.

28.     Likewise, Comcast, for its part, made promises and representations to its customers, including Plaintiff and Class Members, that the PII collected from them would be kept safe and confidential, that the privacy of that information would be maintained in accordance with industry standards and the law, and that it would delete any sensitive information after it was no longer required to maintain it.

29.     On its website, at the top of its Privacy sub-page, Comcast represents to consumers that "[y]our privacy matters to us," and emphasizes that "[w]e know you rely on us to stay connected to the people and things you care about most. And your privacy is essential when you use our products and services. That's why we're always working to keep your personal information secure and put you in control of it."[6]

30.     Indeed, Comcast explicitly states "[w]e believe strong cybersecurity is essential to privacy," and highlights to customers that it works tirelessly to protect their sensitive information from cyberattacks:

> We help protect you with multiple layers of security that automatically detect and block hundreds of thousands of cyber events every second and a team of security experts who work to protect you 24 hours a day, 365 days a year.[7]

---

[6] XFINITY, *Privacy Center,* http://xfinity.com/privacy (last visited Jan. 24, 2025).
[7] *Id.*

31.     Comcast goes on to describe all the "tools and support" it provides to help customers "stay safe online," including "free security software and tools, like multi-factor authentication," and "access to free online tips and advice and an Xfinity security and privacy team to help protect you and your family from cyber threats."[8]

32.     The Xfinity Privacy Policy similarly goes to great lengths to promise customers that Comcast will protect the PII that it collects:

> We follow industry-standard practices to secure the information we collect to prevent the unauthorized access, use, or disclosure of any personal information we collect and maintain. These security practices include technical, administrative, and physical safeguards, which may vary, depending on the type and sensitivity of the information. Although we take the responsibility of safeguarding your personal information seriously, no security measures are 100% effective and we cannot guarantee that these practices will prevent every unauthorized attempt to access, use, or disclose your information. Comcast also takes additional steps to increase the security and reliability of customer communications. We do not read your outgoing or incoming email, file attachments, video mail, private chat, or instant messages. However, we (along with our service providers) use software and hardware tools to help prevent and block "spam" emails, viruses, spyware, and other harmful or unwanted communications and programs from being sent and received over Comcast.net email and the Comcast Services. To help protect you and the Services against these harmful or unwanted communications and programs, these tools may automatically scan your emails, video mails, instant messages, file attachments, and other files and communications. We do not use these tools for marketing or advertising.[9]

33.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

34.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendants had a legal duty to keep their customers' PII safe and confidential.

---

[8] *Id.*

[9] XFINITY, *Privacy Policy*, https://www.xfinity.com/privacy/policy (last visited Jan. 24, 2025).

35.    Defendants had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), contract, industry standards, and representations made to Plaintiff and Class Members, to keep PII confidential and to protect it from unauthorized access and disclosure.

36.    Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendants could not perform the services they provide.

37.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**B.    *The Data Breach***

38.    According to FBCS's filing with the Office of the Maine Attorney General, FBCS discovered the vulnerability on February 26, 2024, but did not notify consumers of the Data Breach until April 26, 2024.[10]

39.    The Notice of Data Event ("FBCS Notice"), posted on the Office of the Maine Attorney General's website, provides:

> On February 26, 2024, FBCS discovered unauthorized access to certain systems in its network. This incident did not impact computer systems outside of FBCS's network. We immediately took steps to secure the impacted environment and launched an investigation with the assistance of third-party computer forensics specialists to determine the full nature and scope of the incident. The investigation determined that the environment was subject to unauthorized access between February 14 and February 26, 2024, and the unauthorized actor had the ability to view or acquire certain information on the FBCS network during the period of access. Therefore, FBCS undertook a comprehensive review of the data at risk to assess if any sensitive information could be affected and to whom it related. We are notifying you because certain information related to you may have been accessed or exfiltrated during the incident. This notification was not delayed as a result of a law enforcement investigation.[11]

---

[10] FBCS Data Breach Notifications, *supra* note 3.
[11] *Id., See* Notice of Data Event.

40.    FBCS's filing with the Office of the Maine Attorney General also specifies that FBCS's customers' names or other personal identifiers in combination with driver's license numbers or non-driver identification card numbers were acquired by an external system breach (hacking).[12]

41.    On October 3, 2024, Comcast filed its own notice with the Maine Attorney General confirming that 237,703 individuals impacted by the FBCS data breach were related to the Comcast portion of the breach.[13]

42.    In or about August 2024, Comcast began sending out its own notice of breach letters ("Comcast Notice"). The Comcast Notice states:

> On March 13, 2024, FBCS notified Comcast that it had experienced a data breach incident, but that Comcast consumer data was not impacted. However, on July 17, 2024, FBCS notified Comcast of its new finding that Comcast data was impacted."

43.    The Comcast Notice goes on to state, "FBCS received your information because they previously provided Comcast with collections-related services for delinquent payments until 2020, when Comcast ceased working with FBCS. The compromised information about you dates from around 2021, as FBCS is subject to data retention requirements beyond Comcast's working relationship with FBCS."

44.    According to the Comcast Notice, the PII involved in the Data Breach may include Plaintiff's and Class Members' names, addresses, Social Security numbers, dates of birth, Comcast account numbers, and ID numbers used internally at FBCS.

45.    Omitted from both the Notice of Data Breach and the Comcast Notice are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial

---

[12] Notice of Data Event, *supra* note 3.
[13] Comcast Supplemental Data Breach Notifications*, supra* note 4.

measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

46.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

47.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII. Nor did Comcast take the precautions and measures needed to adequately vet its vendor, FBCS, to ensure FBCS's data security protocols were sufficient to protect the PII of Comcast's customers, which Comcast turned over to FBCS.

48.     The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

49.     Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

**C.     *Defendants Acquire, Collect, and Store Plaintiff's and Class Members' PII***

50.     Defendants derive a substantial economic benefit from providing services to their customers, and as a part of providing those services, Defendants retain and store the PII of customers, including that of Plaintiff and Class Members.

51.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known they were

responsible for protecting the PII from disclosure. In particular, Comcast was responsible for making sure the PII was safe in the hands of any vendors to which Comcast provided that highly sensitive information.

52. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

53. Plaintiff and Class Members relied on Defendants to keep their PII confidential and maintained securely, to use this information for business purposes only, to provide the information to trusted and secure vendors and other third parties, and to make only authorized disclosures of this information.

54. Defendants could have prevented this Data Breach by properly securing the PII of Plaintiff and Class Members, and ensuring that their vendors did the same.

55. Upon information and belief, Defendants made promises to consumers to maintain and protect PII, demonstrating an understanding of the importance of securing PII.

56. Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D.** ***Defendants Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Susceptible to Cyberattacks***

57. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting institutions that collect and store PII, like Defendants, preceding the date of the Data Breach.

58. Data thieves regularly target companies that receive and maintain PII due to the highly sensitive nature of that information in their custody. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

59.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[14]

60.     In light of recent high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the PII they collected and maintained would be targeted by cybercriminals.

61.     As custodians of PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

62.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data they provided to FBCS and, thus, the significant number of individuals who would be harmed by the exposure of that data.

63.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

64.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members, and Defendants' failure to adequately vet their vendor, FBCS.

---

[14] *See* 2021 Data Breach Annual Report, at 6, IDENTITY THEFT RESOURCE CENTER (Jan. 2022), https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf.

65.     The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

**E.     *Value of Personally Identifiable Information***

66.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

67.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[17]

68.     For example, PII can be sold at a price ranging from $40 to $200.[18] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

69.     Based on the foregoing, the information compromised in the Data Breach is

---

[15] 17 C.F.R. § 248.201 (2016).

[16] *Id.*

[17] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[18] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[19] *In the Dark*, VPNOVERVIEW.COM, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Jan. 24, 2025).

significantly more valuable than the loss of, for example, payment card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—names and Social Security numbers—is impossible to "close" and difficult, if not impossible, to change.

70.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[20]

71.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

72.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

### F.    *Defendants Failed to Comply with FTC Guidelines*

73.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need

---

[20] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[21] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Report to Congressional Requesters*, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

for data security should be factored into all business decision making.

74.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[22] The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

75.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

76.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[22] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

77.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of their data security practices, and those of their vendors. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

78.     Defendants were at all times fully aware of their obligation to protect the PII of customers, yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### G.     *Defendants Failed to Comply with Industry Standards*

79.     As noted above, experts studying cybersecurity routinely identify institutions like Defendants as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

80.     Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendants, include, but are not limited to: educating all employees; strong password requirements; multilayer security, including firewalls; anti-virus and anti-malware software; encryption; multi-factor authentication; backing up data; and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all these industry best practices.

81.     Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow

these cybersecurity best practices.

82.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

83.     Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### H.     *Defendants Breached Their Duties to Safeguard Plaintiff's and Class Members' PII*

84.     In addition to their obligations under federal laws, Defendants owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed duties to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the PII of Class Members.

85.     Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of PII in a timely manner.

86.     Defendants owed a duty to Plaintiff and Class Members to properly vet all third parties to whom they provided the PII of their employees and/or customers, including FBCS.

87.     Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

88.    Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

89.    Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data and failed to audit, monitor, or ensure the integrity of their data security practices. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to adequately vet their vendors to ensure they maintained sufficient data security practices;

b.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

c.    Failing to adequately protect customers' PII;

d.    Failing to properly monitor their own data security systems for existing intrusions;

e.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f.    Failing to adhere to industry standards for cybersecurity as discussed above; and

g.    Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' PII.

90.    Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted PII.

91.    Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in

the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

## I.    *Common Injuries and Damages*

92.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of the value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of FBCS and Comcast, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

## J.    *The Data Breach Increases Victims' Risk of Identity Theft*

93.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

94.    The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

95.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the

data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

96.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

97.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's log-in credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

98.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[23]

---

[23] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KREBSONSECURITY.COM BLOG (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

99.    With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

100.    The development of "Fullz" packages means that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, driver's license numbers, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

### K.    *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

101.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

102.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

103.    These efforts are consistent with the U.S. Government Accountability Office that

released a report in 2007 regarding data breaches in which it noted that victims of identity theft

will face "substantial costs and time to repair the damage to their good name and credit record."[24]

104.    These efforts are also consistent with the steps the FTC recommends that data

breach victims take to protect their personal and financial information after a data breach,

including: contacting one of the credit bureaus to place a fraud alert (and considering an extended

fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on

their credit, and correcting their credit reports.[25]

105.    A study by Identity Theft Resource Center shows the multitude of harms caused by

fraudulent use of personal and financial information:



---

[24] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf
[25] *See* Federal Trade Commission, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited Jan. 24, 2025).

L. *Diminution of Value of PII*

106.    PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyberthefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that PII has considerable market value.

107.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[26]

108.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[27]

109.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[28]

110.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[29]

111.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.

---

[26] David Lazarus, *Shadowy data brokers make the most of their cloak,* LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[27] DATACOUP, https://datacoup.com/ (last visited Jan. 24, 2025).

[28] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, available at: https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visit Jan. 24, 2025).

[29] *See* Ashiq JA, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

**M.    *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

112.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchased by criminals intending to utilize the PII for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

113.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

114.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

115.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost, for a minimum of five years, that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

### N.    *Plaintiff's Experience*

116.    Plaintiff is a former customer of Comcast. Plaintiff gave Comcast her PII as a condition to opening and maintaining an account with Comcast and to receive Comcast's services. In turn, on information and belief, Comcast gave FBCS Plaintiff's PII in connection with FBCS's debt collection services.

117.    Plaintiff provided her PII to Comcast and trusted the company would use reasonable measures to protect it according to Comcast's policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

118.    Plaintiff received a Notice Letter from Comcast dated August 16, 2024, informing her that her PII was included in the Data Breach. In it, Comcast confirmed that Plaintiff's name, address, Social Security number, date of birth, Comcast account number, and ID number used internally at FBCS were impacted in the Data Breach.

119.    At the time of the Data Breach, Comcast retained Plaintiff's and Class Members' PII in their systems, had provided FBCS Plaintiff's PII, and FBCS retained Plaintiff's PII in its systems.

120.    Plaintiff's and Class Members' PII was compromised in the Data Breach and stolen by cybercriminals.

121.    Plaintiff has been injured by the compromise of her PII.

122.    Plaintiff takes reasonable measures to protect her PII. She has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

123.    Plaintiff stores any documents containing her PII in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

124. Had Plaintiff known that Comcast provided sensitive customer PII to vendors, including FBCS, for its business purposes without vetting the vendors' data security adequacy, Plaintiff would not have agreed to be a customer of Comcast.

125. As a result of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach to protect herself from identity theft and fraud. She has monitored, and continues to monitor, her accounts, credit reports and credit scores, and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and duties.

126. And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and scam text messages and phone calls. This misuse of PII is traceable to the Data Breach because cybercriminals routinely obtain information (e.g., phone numbers and email addresses) which can be found online and then target data breach victims with scam calls and messages (i.e., phishing) to elicit more sensitive information—which cybercriminals then combine with the PII exposed in a data breach to commit substantial identity theft and fraud. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach. Because of the Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

127. Plaintiff also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that was entrusted to Defendants, which was compromised in and as a result of the Data Breach.

128.    Plaintiff suffered lost time, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

129.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, being placed in the hands of criminals that will continue for her lifetime.

130.    Defendants obtained and continue to maintain, and continue to allow FBCS to maintain, Plaintiff's PII, and thus have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

131.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS ALLEGATIONS

132.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks certification of the following nationwide class:

> All individuals residing in the United States whose PII was compromised in the Data Breach, including all individuals who received notice of the Data Breach ("Class").

133.    Plaintiff also seeks certification of the following Cable Communications Policy Act Subclass (the "Cable Act Subclass"):

> All individuals residing in the United States whose PII was compromised in the Data Breach, including all individuals who received notice of the Data Breach, and who received Xfinity Residential Services (including Xfinity Cable Television, Xfinity TV, Xfinity Internet, and/or Xfinity Voice).

134.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned, as well as their judicial staff and immediate family members.

135.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as to add subclasses, before the Court determines whether certification is appropriate.

136.    The proposed Class meets the criteria for certification under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

137.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class includes at least 237,703 individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendants' records.

138.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants' conduct violated the FTCA;

    c.    When Defendants learned of the Data Breach;

    d.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f.  Whether Defendants' data security systems, prior to and during the Data Breach, were consistent with industry standards;

g.  Whether Defendants owed duties to Class Members to safeguard their PII;

h.  Whether Defendants breached their duties to Class Members to safeguard their PII;

i.  Whether hackers obtained Class Members' PII via the Data Breach;

j.  Whether Defendants had legal duties to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

k.  Whether Defendants breached their duties to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

l.  Whether Defendants knew or should have known their data security systems and monitoring processes were deficient;

m.  What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

n.  Whether Defendants' conduct was negligent;

o.  Whether Defendants breached express and/or implied contracts with Plaintiff and Class Members;

p.  Whether Defendants were unjustly enriched;

q.  Whether Plaintiff and Class Members are entitled to damages;

r.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

  s. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

139. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

140. <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

141. <u>Predominance</u>. Defendants have engaged in common courses of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

143.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

144.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Negligence and Negligence Per Se**
**(On Behalf of Plaintiff and the Class Against Defendants)**

145.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

146.    Plaintiff and Class Members provided their, PII, or otherwise had their PII provided, to Defendants as a condition of receiving services.

147.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

32

148.    By assuming the responsibility to collect and store this data, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

149.    Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

150.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

151.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

152.    Defendants had and continues to have duties to adequately disclose that the PII of Plaintiff and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

153.    Defendants breached their duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII, including in choosing its vendors

b. Failing to adequately vet third parties/vendors and hold third parties/vendors with whom it shared sensitive Private Information to adequate standards of data protection;

c. Allowing unauthorized access to Class Members' PII;

d. Failing to detect in a timely manner that Class Members' PII had been compromised;

e. Failing to remove former customers' PII that they were no longer required to retain pursuant to regulations; and

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

154. Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

155. Plaintiff and Class Members were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm this statute was intended to guard against.

156. Defendants' violation of Section 5 of the FTCA constitutes negligence per se.

157. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

158. Comcast also violated the Cable Communications Policy Act as described *infra*.

159. Plaintiff and Class Members are subscribers of "cable services" and "other services" within the class of persons the Cable Communications Policy Act was intended to protect.

160. The harm that has occurred is the type of harm the Cable Communications Policy Act was intended to guard against.

161. Indeed, the Cable Communications Policy Act was intended to protect subscribers from the harm caused by the unauthorized disclosure and unlawful retention of subscribers' PII—the same harms alleged herein.

162. Comcast breached its duties to Plaintiff and Class Members under the Cable Communications Policy Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

163. Plaintiff and Class Members were foreseeable victims of Defendants' violations of Section 5 of the FTCA and Comcast's violations of the Cable Communications Policy Act.

164. A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

165. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large

corporations that collect and store PII.

166. Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

167. Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and Class Members, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

168. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

169. Plaintiff and Class Members had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

170. Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

171. Defendants' duties extended to protecting Plaintiff and Class Members from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

172. Defendants have admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

173.    But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

174.    There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Defendants' failures to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

175.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

176.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

177.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII,

which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

178.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

179.    Defendants' negligent conduct is ongoing, in that they still hold the PII of Plaintiff and Class Members in an unsafe and insecure manner.

180.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Express Contract
### (On Behalf of Plaintiff and the Class Against Comcast)

181.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

182.    Comcast offered to provide services to its customers, including Plaintiff and Class Members, in exchange for payment.

183.    Comcast also required Plaintiff and Class Members to provide it with their PII in order to receive services.

184.    In turn, Comcast expressly promised to protect Plaintiff's and Class Members' PII through adequate data security measures.

185.    Comcast's Privacy Policy is an agreement between Comcast and individuals who

provided their PII to Comcast, including Plaintiff and Class Members.[30]

186.    Plaintiff and Class Members accepted Comcast's offer by providing their valuable PII to Comcast in exchange for Plaintiff and Class Members receiving Comcast's services, and then by paying for and receiving the same.

187.    Plaintiff and Class Members would not have done the foregoing but for the above-described agreement with the company.

188.    A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Comcast in exchange for, amongst other things, the protection of such information.

189.    Plaintiff and Class Members fully performed their obligations under the express contracts with Comcast.

190.    However, Comcast breached the express contracts it made with Plaintiff and Class Members by failing to safeguard and protect their PII and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

191.    In sum, Plaintiff and Class Members have performed under the relevant agreements, or such performance was waived by the conduct of Comcast.

192.    As reasonably foreseeable result of the Data Breach, Plaintiff and Class Members were harmed by Comcast's failure to use reasonable data security measures to store their PII, including, but not limited to, the actual harm through the loss of their PII to cybercriminals.

193.    Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

---

[30] *Privacy Policy*, *supra* note 9.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class Against Comcast)

194.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

195.    Comcast offered to provide services to its customers, including Plaintiff and Class Members, in exchange for payment.

196.    Comcast also required Plaintiff and Class Members to provide it with their PII in order to receive services.

197.    In turn, Comcast impliedly promised to protect Plaintiff's and Class Members' PII through adequate data security measures.

198.    Plaintiff and Class Members accepted Comcast's offer by providing their valuable PII to Comcast in exchange for Plaintiff and Class Members receiving Comcast services, and then by paying for and receiving the same.

199.    Plaintiff and Class Members would not have done the foregoing but for the above-described agreement with the company.

200.    A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Comcast in exchange for, amongst other things, the protection of such information.

201.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Comcast.

202.    However, Comcast breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their PII and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

203.    In sum, Plaintiff and Class Members have performed under the relevant agreements, or such performance was waived by the conduct of Comcast.

204.    As a reasonably foreseeable result of the Data Breach, Plaintiff and Class Members were harmed by Comcast's failure to use reasonable data security measures to store their PII, including, but not limited to, the actual harm through the loss of their PII to cybercriminals.

205.    Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class Against Defendants)

206.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

207.    This count is brought in the alternative to Plaintiff's breach of express and/or implied contract claims.

208.    Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from payments made by or on behalf of their clients for services.

209.    As such, a portion of the value and monies derived from payments made by its clients for services is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

210.    Plaintiff and Class Members conferred a monetary benefit on Defendants in providing them with their valuable PII.

211.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

212.    In particular, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decisions to prioritize their own profits over the requisite security.

213.    Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

214.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefits that Plaintiff and Class Members conferred upon it.

215.    Plaintiff and Class Members have no adequate remedy at law.

216.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject

to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

217.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

### COUNT V
**Violation of the Cable Communications Policy Act, 47 U.S.C. § 521 *et seq.***
**(On Behalf of Plaintiff and the Class Against Comcast, or Alternatively, on Behalf of Plaintiff and the Cable Act Subclass Against Comcast)**

218.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

219.    The Cable Communications Policy Act provides in relevant part that "a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned and shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the subscriber or cable operator." 47 U.S.C. § 551(c).

220.    The Cable Communications Policy Act further provides that "[a]ny person aggrieved by any act of a cable operator in violation of this section may bring a civil action in a United States district court." 47 U.S.C. § 551(f)(1).

221.    Comcast is a cable operator as it "provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system," or "otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C. § 522(5).

222.    Comcast's provision of Xfinity TV and cable services to Plaintiff and Class Members qualifies as "cable services" as defined by the Cable Communications Policy Act because such services include "the one-way transmission to subscribers of video programming or other programming service and subscriber interaction which is required for the selection or use of the video programming or other programing service." 47 U.S.C. § 522(6).

223.    Comcast's provision of internet service to Plaintiff and Class Members separately qualifies as an "other service" as defined by the Cable Communications Policy Act because such internet service is a "wire or radio communication[] service provided using any of the facilities of a cable operator that are used in the provision of cable service." 47 U.S.C. § 551(a)(2).

224.    Comcast's provision of Xfinity Voice service to Plaintiff and Class Members also separately qualifies as an "other service" as defined by the Cable Communications Policy Act because such Voice service is a "wire or radio communication[] service provided using any of the facilities of a cable operator that are used in the provision of cable service." 47 U.S.C. § 551(a)(2).

225.    Plaintiff's and Class Members' PII is "personally identifiable information" within the meaning of 47 U.S.C. § 551.

226.    Plaintiff and Class Members are "subscribers" of Comcast's "cable services" and "other services" within the meaning of 47 U.S.C. § 551 because they have paid for and/or purchased cable/television service, internet service, and/or mobile service from Comcast.

227.    At all relevant times hereto, pursuant to 47 U.S.C. § 551, Comcast was required to take such actions as necessary to prevent unauthorized access to Plaintiff's and Class Members' PII by a person other than the subscriber or cable operator.

228.    Comcast violated 47 U.S.C. § 551(c) by failing to prevent unauthorized access to Plaintiff's and Class Members' PII by unauthorized third parties.

229.    Comcast violated 47 U.S.C. §§ 551(c) and (e) through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its customers; (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII; (i) failing to timely patch known vulnerabilities to its computer systems or networks; and (j) failing to destroy PII no longer necessary for the purpose for which it was collected.

230.    As a direct and proximate result of Comcast's violation of 47 U.S.C. § 551(c) and (e), Plaintiff and Class Members have suffered injuries, including:

    a.   Theft of their PII;

    b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.  Costs associated with purchasing credit monitoring and identity theft protection services;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII entrusted, directly or indirectly, to Comcast with the mutual understanding that Comcast would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII, which remains in Comcast's possession and is subject to further breaches so long as Comcast fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

    i.   Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

231.   As a direct and proximate result of Comcast's violation of the Cable Communications Policy Act, Plaintiff and Class Members seek statutory damages of at least $1,300 per subscriber per violation or actual damages (the statute awards damages of $100 per day or $1,000, whichever is greater, and Comcast's violation lasted from approximately October 10-23, 2023), as well as all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Comcast[31] and that the Court enter an Order:

    A.   Certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

    B.   Granting equitable relief and enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

    C.   Granting injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including, but not limited to:

---

[31] As stated, *supra*, FBCS is named as a nominal defendant, and Plaintiff does not seek relief from FBCS directly in this action.

i.      prohibiting Comcast from engaging in the wrongful and unlawful acts described herein;

ii.      requiring Comcast to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.      requiring Comcast to create a vendor-vetting process that thoroughly analyzes its vendors' data security practices to ensure they are in compliance with state and federal law and industry standards;

iv.      requiring Comcast to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Comcast can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

v.      requiring Comcast to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.      prohibiting Comcast from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.      requiring Comcast to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Comcast's systems on a periodic basis, and ordering Comcast

to promptly correct any problems or issues detected by such third-party security auditors;

viii.   requiring Comcast to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.   requiring Comcast to audit, test, and train their security personnel regarding any new or modified procedures; requiring Comcast to segment data by, among other things, creating firewalls and access controls so that if one area of Comcast's network is compromised, hackers cannot gain access to other portions of Comcast's systems;

x.   requiring Comcast to conduct regular database scanning and securing checks;

xi.   requiring Comcast to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.   requiring Comcast to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Comcast to implement a system of tests to assess their respective employees' knowledge of the education programs discussed

in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Comcast's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Comcast to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Comcast's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Comcast to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Comcast to implement logging and monitoring programs sufficient to track traffic to and from Comcast's servers; and

xvii.    for a period of ten years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Comcast's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including

expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 24, 2025                    Respectfully submitted,

By:    */s/ Andrew Ferich*                    
Andrew W. Ferich (PA I.D. 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel.: 310-474-9111
Fax: 310-474-8585
aferich@ahdootwolfson.com

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: 954-525-4100
ostrow@kolawyers.com

Charles E. Schaffer (PA I.D. 76259)
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
cschaffer@lfsblaw.com

John A. Yanchunis*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street 7th Floor
Tampa, FL 33602
Tel: 813-223-5505
JYanchunis@forthepeople.com

Jonathan S. Mann*
**PITTMAN, DUTTON, HELLUMS,**
**BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: 205-322-8880
E: jonm@pittmandutton.com

*Counsel for Plaintiff & the Putative Classes*

*\*pro hac vice* pending or to be filed